Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/14/2026 08:11 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
DANIEL S. NICKELS, APPELLANT.

___ N.W.3d ___

Filed August 14, 2026.    No. S-25-013.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
2. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error based on the district court's refusal to give the self-defense instruction an appellant requested, the appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.
3. **Statutes: Appeal and Error: Words and Phrases.** When terms in a statute are not specifically defined by the statute, principles of statutory interpretation generally require an appellate court to give such terms their plain and ordinary meaning.
4. **Appeal and Error: Words and Phrases.** Appellate courts often turn to dictionaries to ascertain a word's plain and ordinary meaning.
5. **Statutes: Words and Phrases.** Under the associated words canon of statutory interpretation, if two or more words are grouped together in a statute, the meaning of a particular word may be determined by reference to the meaning of associated words and phrases.
6. **Appeal and Error.** Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.
7. ____. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.

8. **Trial: Testimony: Appeal and Error.** The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.

9. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under the framework established by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

10. \_\_\_\_: \_\_\_\_. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

11. \_\_\_\_: \_\_\_\_. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

12. **Words and Phrases.** A reasonable probability of prejudice is a probability sufficient to undermine confidence in the outcome.

13. **Effectiveness of Counsel: Appeal and Error.** In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.

14. **Effectiveness of Counsel: Records: Appeal and Error.** An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record.

15. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Natalie M. Andrews, of Chandler | Conway, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

FUNKE, C.J., CASSEL, STACY, PAPIK, FREUDENBERG, BERGEVIN, and VAUGHN, JJ.

Papik, J.

Daniel S. Nickels shot and killed Esmeralda Vargas in a hotel room. He had paid Vargas for sex, but after he concluded Vargas was "procrastinating," he decided to leave. An argument and altercation ensued in which Nickels shot and killed Vargas. Nickels claimed that he shot Vargas because he believed she was reaching into her backpack for a handgun to shoot him. At Nickels' trial for first degree murder and use of a deadly weapon to commit a felony, the district court instructed the jury on self-defense, but, over Nickels' objection, included language in the self-defense instruction stating that Nickels had a duty to retreat. The jury found Nickels guilty of both charges. Now on appeal, Nickels contends that, because the hotel room was his dwelling for purposes of Neb. Rev. Stat. § 28-1409(4)(b)(i) (Reissue 2016), he had no duty to retreat and the district court erred by including the duty to retreat language in the self-defense instruction. He also contends that the district court made an evidentiary error and that his trial counsel was ineffective in two respects. Finding no reversible error, we affirm.

## I. BACKGROUND

The State charged Nickels with first degree murder and use of a deadly weapon to commit a felony. At trial, the State presented evidence that on the morning Vargas was shot, she and Nickels entered a hotel room together around 3 a.m. A couple hours later, Vargas ran out of the hotel room and down the hall before collapsing. At the same time, Nickels ran out of the hotel room in the other direction. He left the hotel and drove to Missouri, where he was later apprehended. Vargas died that morning from a single gunshot wound.

Nickels testified in his own defense. He admitted to shooting Vargas in the hotel room but claimed that he did so in self-defense.

Nickels testified that Vargas was an "escort" and that on prior occasions, he had paid her to engage in sex with him, but

that on other occasions, he had given her rides without receiving anything in return. Nickels testified that in the early morning hours on the day of the shooting, he had picked Vargas up at a hotel where he had rented her a room and drove her to another location where she purchased drugs. Nickels testified that Vargas began using the drugs as he drove back to the hotel and that during that drive, Vargas seemed "delusional, maybe." Nickels claimed that during the drive, Vargas asked him to stop behind a gas station because "she heard voices, and somebody was getting hurt back there." Nickels also testified that during the drive, Vargas asked him to "take care" of some people who had hurt her sister, which Nickels understood to be a request to help Vargas kill those people. Nickels testified that Vargas seemed "mad at . . . everything."

Nickels testified that after they entered the hotel room on the morning of the shooting, he paid Vargas for sex, but she was "procrastinating," so he decided to leave. Nickels testified that after he got up to leave, Vargas became angry and eventually grabbed him by his collar, blocked his exit, and told him that he "wasn't going anywhere until [he] gave her the rest of [his] money." Nickels testified that at some point while Vargas was blocking his exit, he "perceived" that she was putting her hand in a backpack she was wearing. Nickels claimed that a few days earlier, he had seen a gun in that backpack. Believing that Vargas was reaching for that gun, Nickels reached into his pocket, grabbed his own gun, and fired it at Vargas.

Nickels admitted on cross-examination that he never saw a gun in Vargas' possession on the night he shot her and that Vargas had never previously been violent with him. He also admitted that he could not actually see whether Vargas was reaching into the backpack because a jacket was covering the backpack.

The jury was instructed as to self-defense, but it convicted Nickels of both charges. He now appeals. We describe Nickels'

claims and provide additional facts as necessary in the analysis section below.

## II. ASSIGNMENTS OF ERROR

Nickels assigns four errors, which we have restated as follows. First, Nickels assigns error to the district court's inclusion of language in the self-defense jury instruction indicating he had a duty to retreat. Second, Nickels assigns error to the district court's refusal to allow evidence as to Nickels' character trait for peacefulness during the prosecution's case in chief. Third, Nickels asserts that his trial counsel provided ineffective assistance of counsel by failing to adduce evidence, through two witnesses, of specific instances of conduct demonstrating Vargas' "violent, erratic, and aggressive behavior." Finally, Nickels claims that his counsel provided ineffective assistance of counsel by failing to object and move for a mistrial based on the prosecutor's and a detective's use of the word "murder" during trial.

## III. ANALYSIS

### 1. Duty to Retreat Instruction

The district court gave the jury the following instruction regarding self-defense:

[Nickels] acted in self-defense if:

1. [Vargas] threatened or attempted to cause death or serious bodily harm to [Nickels]; and

2. [Nickels] did not provoke any use of force by [Vargas] against [Nickels] with the intent of using deadly force in response; and

3. Under the circumstances as they existed at the time, [Nickels] reasonably believed that his use of deadly force was immediately necessary to protect himself against any such force used by [Vargas]; and

4. Before using deadly force, [Nickels] either tried to get away or did not try because he reasonably did not believe he could do so in complete safety.

The fact that [Nickels] may have been wrong in estimating the danger to himself does not matter as long as there was a reasonable basis for what [Nickels] believed and he acted reasonably in response to that belief.

The State [of] Nebraska has the burden to prove beyond a reasonable doubt that [Nickels] did not act in self-defense.

Nickels argues on appeal that while the district court was correct to provide the jury with a self-defense instruction, paragraph 4 should not have been included. He contends that, under the circumstances, he had no duty to retreat from Vargas.

(a) Additional Background

The following facts adduced at trial are relevant to Nickels' argument that the district court erred by including the duty to retreat language in the self-defense instruction.

The afternoon before Nickels shot and killed Vargas, Nickels picked her up and gave her a ride to the hotel where the shooting would later take place. At around 6 p.m. that day, Nickels entered the hotel and rented a room. Nickels testified at trial that he rented the room because Vargas did not have photo identification. He testified that Vargas later paid him cash for the cost of the room. Nickels testified that on at least one prior occasion, he had paid for a motel room for Vargas. When Nickels was later apprehended after Vargas was shot, he had a key to the hotel room in his possession.

Shortly after Nickels rented the hotel room, Vargas entered the hotel and went to the room and remained there until approximately 2 a.m. the next day. Nickels, on the other hand, left the hotel after he paid for the room. He testified that he went back to his home where he had dinner with a friend.

Surveillance videos presented to the jury showed that while Vargas remained at the hotel, two unidentified males separately came to the room and left after some time. After one of them left, Vargas walked through the hall with wet hair, wearing what the district court described as a "long cloth or some

sort of a long shirt." Police later found a used condom in the hotel room's trash can.

Nickels returned to the hotel around 2 a.m., at which point Nickels drove Vargas to another location where she purchased drugs. Nickels and Vargas returned to the hotel just after 3 a.m. They then both went to the hotel room and remained there until about 5:30 a.m.

Nickels testified that the hotel room was a suite with a living room and a bedroom. He and Vargas first sat in the living room and conversed while Vargas continued to use the drugs she had purchased. Nickels testified that, at the time, he was "[w]illing" to pay for sex with Vargas but that Vargas was falling asleep in a chair. Nickels eventually became impatient and offered Vargas $100 to "expedite this thing and get the show on the road and take care of business." Nickels testified that Vargas agreed but asked for $120, which Nickels testified that he paid.

Vargas then went to the bedroom, and Nickels followed. After some additional time passed, Nickels concluded Vargas was "procrastinating" and decided to leave. The argument and altercation in which Nickels shot Vargas followed.

A number of personal items belonging to Vargas were found in the hotel room. Nickels admitted that he did not bring any additional clothes or a toothbrush to the hotel room. When he was asked on cross-examination if he was "staying" at the hotel, he responded, "I had nothing at the hotel. I rented the room for [Vargas]."

### (b) Jury Instruction Conference

At the jury instruction conference, the district court, over the State's objection, agreed to give a self-defense instruction. The district court concluded there was enough evidence presented that Nickels acted in self-defense to provide the instruction.

During the jury instruction conference, Nickels objected to the inclusion of paragraph 4 in the self-defense instruction quoted above. He argued that because he had rented the room,

the hotel room was his "temporary domicile" in which he had no duty to retreat. The State argued that Nickels did have a duty to retreat. It emphasized that Vargas paid Nickels for the room and she "was the one utilizing the room."

The district court overruled Nickels' motion and gave the instruction with paragraph 4 included. In explaining its ruling, it emphasized that Vargas had paid Nickels back for renting the room; that Vargas had occupied the room for the vast majority of the time, while Nickels was in room for only around 2 hours; that Vargas had various personal items in the room; and that two other men had visited Vargas in the hotel room, and, based on the used condom found in the trash can, at least one of those other men appeared to have had sexual relations with Vargas in the room. The district court stated that it was "clear, consonant, and unequivocal that [Vargas] had custody and control of the room."

### (c) Standard of Review

[1] Whether a jury instruction is correct is a question of law, which an appellate court independently decides. *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016).

### (d) Analysis

Before analyzing Nickels' argument regarding the district court's self-defense instruction, we pause to clarify the precise argument Nickels made before the district court regarding this instruction and the arguments he now makes on appeal. We do so because Nickels makes an argument on appeal he did not present to the district court, and we apply a different standard of review to arguments that are raised for the first time on appeal.

As noted above, during the jury instruction conference in the district court, Nickels requested that the self-defense instruction be given but argued to the district court that paragraph 4 should be removed because the hotel room was his "temporary domicile." Nickels thus effectively proposed that the jury be instructed on self-defense but with no mention of a duty to

retreat. And although Nickels' counsel did not expressly refer to § 28-1409(4)(b)(i), we understand counsel to have proposed that such an instruction was required by that statute.

Now on appeal, Nickels renews his argument that paragraph 4 should have been excised from the self-defense instruction pursuant to § 28-1409(4)(b)(i), but he also argues that the paragraph should have been removed because, under the circumstances, there was no possibility he could retreat. This second argument was not presented to the district court.

The failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003). The purpose of the instruction conference is to give the trial court an opportunity to correct any errors made by it. *Id.* Consequently, a party who does not request a desired jury instruction cannot complain on appeal about incomplete instructions. *Id.* Furthermore, an objection to a jury instruction on one ground does not preserve an objection to that jury instruction on another ground. See, *State v. Reeves*, 321 Neb. 427, 35 N.W.3d 46 (2026); *Mowell, supra*. Rather, to preserve an alleged error, the party must "specifically object to that error." *Mowell*, 267 Neb. at 93, 672 N.W.2d at 398. Where a party objects to an instruction on one ground in the trial court and attempts to raise a different objection to that instruction on appeal, it is only reviewable for plain error. See *Reeves, supra*.

Applying the foregoing error preservation rules here, Nickels has fully preserved an argument that paragraph 4 should have been removed from the self-defense instruction because the hotel room was his dwelling and, thus, he had no duty to retreat pursuant to § 28-1409(4)(b)(i). We review that argument accordingly below. Because Nickels did not present any objection to the duty to retreat language based on his alleged inability to retreat in the hotel room, however, he has not fully preserved that argument for appeal. We will

thus review that issue under a plain error standard of review. We will also review for plain error an issue that is potentially implicated by our analysis but that Nickels did not raise either in the district court or before us.

### (i) § 28-1409(4)(b)(i) Did Not Obligate District Court to Give Nickels' Proposed Instruction

We first address Nickels' argument that the self-defense instruction should have been given without including paragraph 4 because the hotel room was Nickels' dwelling for purposes of § 28-1409(4)(b)(i), and, thus, he had no duty to retreat.

Section 28-1409(4) provides that the use of deadly force is not justifiable if

> (b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:
>
> (i) The actor shall not be obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be[.]

We have previously observed that § 28-1409(4)(b) creates a general duty to retreat, but § 28-1409(4)(b)(i) recognizes a "corollary privilege of nonretreat." *State v. Harris*, 294 Neb. 766, 780, 884 N.W.2d 710, 720 (2016). The privilege of non-retreat, however, exists only in one's "dwelling or place of work" and only if the actor was not "the initial aggressor." See § 28-1409(4)(b)(i). For purposes of § 28-1409, the Legislature has defined "[d]welling" as "any building or structure, though movable or temporary, or a portion thereof, which is for the time being the actor's home or place of lodging." Neb. Rev. Stat. § 28-1406(5) (Reissue 2016).

Nickels concedes that he was not at his place of work or at his home when he shot Vargas. Accordingly, he was entitled

to the privilege of nonretreat only if the hotel room was, in the words of § 28-1406(5), his "place of lodging."

Nickels argues the hotel room was his place of lodging when he shot Vargas. While Nickels admits that there is no evidence he slept in the hotel room, he observes that some dictionaries include a definition of "lodging" as "a temporary place to stay." See, e.g., Merriam-Webster's Collegiate Dictionary 731 (11th ed. 2020). Nickels asserts the hotel room qualified as his place of lodging under this definition, emphasizing the evidence showing that he was in the hotel room with Vargas for approximately 2 hours. Nickels also claims that the hotel room was his "place of lodging" because he rented the room from the hotel and had a key to access it. And even if the hotel room was Vargas' place of lodging, Nickels adds, that does not mean it was not his as well. On this point, Nickels directs us to *State v. White*, 20 Neb. App. 116, 819 N.W.2d 473 (2012), in which the Nebraska Court of Appeals held the privilege of nonretreat recognized in § 28-1409(4)(b)(i) applied even when the defendant and the victim were cohabitants of a residence.

[2] To establish reversible error based on the district court's refusal to give the self-defense instruction he requested, Nickels has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) he was prejudiced by the court's failure to give the requested instruction. See *State v. White*, 321 Neb. 1, 32 N.W.3d 256 (2026). We find, however, that the instruction Nickels proposed to the district court—that the self-defense instruction be given without paragraph 4 and with no additional instructions provided—was not warranted by the evidence. Here is why.

Many other jurisdictions have statutes that similarly recognize a privilege of nonretreat in certain locations, often a person's dwelling. See, e.g., N.Y. Penal Law § 35.15(2)(a)(i) (McKinney Supp. 2026); N.J. Stat. Ann. § 2C:3-4(b)(2)(b)(i) (West 2015); 18 Pa. Stat. and Cons. Stat. Ann. § 505(b)(2)(ii)

(West 2015). Courts in several of those states have held that the question of whether a person is in their dwelling and thus entitled to the privilege of nonretreat is one of fact and, as a result, in a jury trial, must be resolved by the jury so long as there is evidence to support either conclusion.

For example, in *People v. Berk*, 88 N.Y.2d 257, 667 N.E.2d 308, 644 N.Y.S.2d 658 (1996), a trial court instructed a jury as to self-defense but declined the defendant's request that it also instruct the jury that the defendant had no duty to retreat because the shooting occurred in his dwelling. The New York Court of Appeals held this was not error. It explained that whether the home in question was the defendant's dwelling was a "disputed factual question" on which "there was substantial evidence" on both sides. *Id.* at 267, 667 N.E.2d at 313, 644 N.Y.S.2d at 663. Accordingly, the appellate court explained, it was not error for the trial court to decline to instruct the jury that the defendant had no duty to retreat.

Several other jurisdictions have likewise concluded that when there is conflicting evidence as to whether a defendant was in a specific place where the law afforded them a privilege of nonretreat, that is a factual determination that must be made by the jury. See, e.g., *State v. Bragg*, 260 N.J. 387, 334 A.3d 184 (2025) (holding jury must decide disputed factual issues of whether apartment where stabbing took place was defendant's dwelling and whether defendant was initial aggressor); *Widdison v. State*, 410 P.3d 1205 (Wyo. 2018) (holding trial court erred by not instructing jury to decide whether defendant was in her residence and thus was entitled to privilege of nonretreat when there was conflicting evidence on the question); *Com. v. Hornberger*, 74 A.3d 279, 286 (Pa. Super. 2013) (holding trial court should instruct jury to determine whether defendant was in his dwelling and thus entitled to privilege of nonretreat because facts "constituted a viable jury question").

We agree with these courts and hold that when there is evidence to support a conclusion that a defendant was in his or

her dwelling but also evidence to support a contrary conclusion, the jury should be instructed to make that factual determination. Specifically, the jury should be instructed to determine whether the defendant was in his or her dwelling and additionally instructed that whether the defendant is entitled to the privilege of nonretreat depends on that factual determination. For the same reason, we conclude that when there is conflicting evidence as to whether the defendant was the initial aggressor, the jury should be instructed to determine whether that is the case and additionally instructed that the defendant is not entitled to the privilege of nonretreat if he or she is found to be the initial aggressor.

It follows from our preceding conclusions that it would be improper to altogether remove language about a defendant's duty to retreat in the manner Nickels requested at the jury instruction conference, unless the only conclusion the jury could reach based on the evidence is that the defendant was in his or her dwelling and was not the initial aggressor. But that is not the case here. As we will explain, even if we set to the side the initial aggressor question, there was evidence by which the jury could have concluded that the hotel room was not Nickels' place of lodging.

We begin our explanation by exploring the meaning of the phrase "place of lodging." On this point, we first observe that for Nickels to be entitled to the privilege of nonretreat, it is not sufficient that he be present in a "place of lodging." "Dwelling" is defined to mean "*the actor's* home or place of lodging." § 28-1406(5) (emphasis supplied). The relevant question is thus not whether the hotel room was *a* place of lodging, but whether it was *Nickels'* place of lodging.

[3,4] Focusing now on whether the hotel room was Nickels' place of lodging, we consider the meaning of that phrase. Although § 28-1406(5) defines dwelling to include a defendant's "place of lodging," the statute does not further define the phrase "place of lodging." When terms in a statute are not specifically defined by the statute, our principles of

statutory interpretation generally require us to give such terms their plain and ordinary meaning. *Aguilar v. Valdez-Mendoza*, 318 Neb. 402, 16 N.W.3d 130 (2025). We often turn to dictionaries to ascertain a word's plain and ordinary meaning. *Id.* Here, Nickels is correct that at least one dictionary includes a definition of "lodging" as "a temporary place to stay." See Merriam-Webster's Collegiate Dictionary 731 (11th ed. 2020). But this definition appears alongside others, which define "lodging" as a "a place to live" or "sleeping accommodations." *Id.* See, also, 8 The Oxford English Dictionary 1098 (2d ed. 1989) ("[a]ccommodation for rest at night or for residence").

We have no doubt that a place where a person sleeps or stays overnight qualifies as that person's "place of lodging" under the statute. Much more difficult to accept is Nickels' suggestion that any building or structure at which someone remains for as little as a couple hours and for any purpose qualifies as the person's place of lodging. If that were so, places of lodging would multiply beyond measure; retail establishments, houses of worship, sports arenas, medical clinics, other people's homes, and any other building or structure would seem to qualify as an individual's place of lodging once he or she remained at the location for enough time. Because we are confident that these places would not commonly be considered places of lodging merely because a person remained there for some length of time, we reject Nickels' suggestion as untenable.

Further, the dictionary definition of "lodging" as "a temporary place to stay" appears to use the word "stay" in a particular sense. Coming directly after the definition of lodging as "a temporary place to stay," and relied on by Nickels, is a parenthetical suggesting that "stay[ing]" is "for the night." See Merriam-Webster's Collegiate Dictionary, *supra*. Indeed, in everyday conversation, asking a friend where he or she will "stay" during travels is usually not an inquiry about all the locations the friend might visit and remain for some time,

but, rather, a question about where he or she will sleep for the night.

[5] The fact that the phrase "place of lodging" appears alongside "home" in § 28-1406(5) provides an additional clue that "place of lodging" is not as broad as Nickels suggests. Under the associated words canon of statutory interpretation, if two or more words are grouped together in a statute, the meaning of a particular word may be determined by reference to the meaning of associated words and phrases. *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021). Specifically, the canon directs that words grouped together in a statutory list should be given related meaning. See *id.* This canon is often applied to avoid giving "unintended breadth" to statutory language. *McDonnell v. United States*, 579 U.S. 550, 569, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016) (internal quotation marks omitted). The placement of the phrase "place of lodging" next to "home" in § 28-1406(5) suggests that a person's dwelling includes both their actual home and a place they are temporarily treating like their home.

With this understanding of "place of lodging" in mind, we conclude that there was evidence by which the jury could have concluded that the hotel room was not Nickels' place of lodging. Although Nickels rented the room from the hotel, when he was asked at trial if he was "staying" at the hotel, he responded that he "rented the room for [Vargas]." Consistent with that description, Nickels did not sleep in the hotel room and did not have a change of clothes, a toothbrush, or other personal items one might bring for an overnight stay. Furthermore, Nickels spent only about 2 hours in the hotel room, during which he conversed with Vargas and waited for the possibility of having sex with her. And when Vargas did not engage in sex as soon as Nickels hoped, he decided to leave. In this respect, one could conclude that Nickels was visiting the hotel room merely to complete a transaction, not because he was treating it like a temporary home.

Because there was evidence that would have allowed the jury to conclude that the hotel room was not Nickels' dwelling, the self-defense instruction Nickels requested—the self-defense instruction the district court gave but with paragraph 4 deleted entirely—was not warranted by the evidence. Accordingly, the district court did not err in declining to give it.

*(ii) District Court Did Not Plainly Err in Failing
to Instruct Jury to Determine Whether
Hotel Room Was Nickels' Dwelling*

Having concluded that the argument Nickels fully preserved for appeal lacks merit, we proceed to consider whether the district court's self-defense instruction amounted to plain error. We mentioned above an argument that Nickels raised for the first time on appeal that we will review for plain error. But before we get to that, we address an argument that we antici-pate Nickels might make based on our analysis above.

Specifically, we anticipate that Nickels might respond to our analysis above by contending that even if paragraph 4 should not have been removed, the district court should have at least directed the jury to determine whether the hotel room qualified as Nickels' dwelling under § 28-1409(4)(b)(i) and additionally instructed the jury that if it found the hotel room was his dwelling, he was not obligated to retreat. Here, we imagine Nickels might say that even if the evidence was not so one-sided on the dwelling question to justify the removal of paragraph 4 entirely, neither did it conclusively establish that the hotel room was *not* his dwelling. Nickels, however, has not argued either before the district court or this court that the jury should have been instructed to determine whether the hotel room was his dwelling. Accordingly, we could review this issue for, at most, plain error. See, *In re Estate of Meyers*, 320 Neb. 871, 31 N.W.3d 591 (2026) (absent plain error, appellate court can consider only errors both specifically assigned and specifically argued); *State v. Buol*, 314 Neb. 976, 994 N.W.2d

98 (2023) (absent plain error, issue raised for first time on appeal will be disregarded).

[6,7] At this point, it must be recalled that the plain error standard imposes a threshold that is not easily cleared. Not every error that a trial court might make constitutes plain error. See *Peterson v. Brandon Coverdell Constr.*, 318 Neb. 342, 15 N.W.3d 698 (2025). We have said that plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Horne*, 315 Neb. 766, 1 N.W.3d 457 (2024). We have additionally observed that courts should find plain error "only in those rare instances where it is warranted," see *State v. McSwine*, 292 Neb. 565, 582, 873 N.W.2d 405, 418 (2016), as opposed to invoking it "routinely," see *id*. at 583, 873 N.W.2d at 418. We have also said that generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur. *State v. Anthony*, 320 Neb. 757, 30 N.W.3d 187 (2026).

Our precedent also reveals that for an error to be "plainly evident from the record," it must be more than a run-of-the-mill mistake; the error must instead be obvious. Our opinion in *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021), illustrates the point. In that case, we found that a district court did not plainly err when, in a trial for perjury, it received a 131-page transcript of an earlier county court trial that included, on the 129th page, a statement from the county court judge that he believed that perjury had been committed. We explained that the defendant did not raise an objection in the district court based on the county court judge's comment and that without such an objection, the district court was not obligated to review the exhibit "sua sponte for potentially prejudicial content not objected to by the parties." *Id.* at 445, 960 N.W.2d at 598. We cited approvingly to multiple federal cases in which courts explained that for the admission of evidence to

constitute plain error, the evidence must be "obviously inadmissible." *Id.* at 445 n.35 (citing *U.S. v. Williams*, 527 F.3d 1235 (11th Cir. 2008), and *United States v. Amador-Flores*, 728 Fed. Appx. 839 (10th Cir. 2018)) (internal quotation marks omitted).

Other opinions from this court likewise demonstrate that an error must be obvious for it to be plainly evident from the record. In *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *disapproved on other grounds, State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025), we concluded that in determining whether an error was "plain," we would follow the approach adopted by the U.S. Supreme Court in *Johnson v. United States*, 520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), and ask whether the error was plain at the time of appellate consideration. See, also, *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012) (concluding that error is plain for purposes of plain error review if it was plain at time of appellate consideration). In *Johnson*, the U.S. Supreme Court explained that for an error to qualify as plain, it must be "clear" or "obvious." *Id.*, 520 U.S. at 467 (internal quotation marks omitted) (quoting *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).

In this case, we cannot say that it was clear or obvious that the district court should have instructed the jury to determine whether the hotel room was Nickels' dwelling. For one thing, prior to this case, this court had never held that where the evidence is in conflict as to whether a defendant was present in his or her dwelling and thus entitled to the privilege of nonretreat, the jury must make that determination. On top of that, even if that legal proposition had been previously established, the evidence in this case did not make it clear or obvious that this was a case in which the jury should decide whether the hotel room was Nickels' dwelling. As discussed above, Nickels did not sleep in the hotel room, had no belongings in the room suggesting he was planning for an overnight stay, was present in the hotel room for only about 2 hours, and

specifically testified that he "rented the room for [Vargas]." It was not plainly evident from the record that the district court should have instructed the jury to determine whether the hotel room was Nickels' dwelling.

### (iii) District Court Did Not Plainly Err by Including Duty to Retreat Language in Self-Defense Instruction

Finally, we address Nickels' argument raised for the first time on appeal that paragraph 4 should have been removed from the self-defense instruction because he could not have retreated in the hotel room. For this argument, Nickels relies on *State v. Schroeder*, 199 Neb. 822, 261 N.W.2d 759 (1978).

In *Schroeder*, a defendant was charged with assault with intent to inflict great bodily injury after he stabbed his prison cellmate. The defendant requested an instruction based on the defense of choice of harms, which the trial court refused to give. This court found that the trial court did not err in refusing to give the instruction, reasoning that there was no evidence that would allow the jury to conclude that the defendant believed an assault was imminent. The opinion also stated that while those threatened with force ordinarily have a duty to retreat, "[t]he duty to retreat was not applicable here because the defendant could not retreat." *Id.* at 826, 261 N.W.2d at 761.

Relying on the above-quoted language, Nickels argues that paragraph 4 should not have been included in the self-defense instruction because, like the inmate confined to a prison cell in *Schroeder*, there was no way for him to retreat in the hotel room. Again, however, we find that Nickels has not demonstrated plain error. We first note that the language from *Schroeder* that Nickels relies upon is dicta, as it was not necessary to this court's determination that the trial court did not err in refusing to give the defendant's requested instruction. Additionally, Nickels points us to little evidence showing that the hotel room, or, more precisely, the suite of rooms, was

equivalent to a prison cell with respect to his ability to retreat. But even setting those facts to the side, we are confident that no miscarriage of justice took place. Paragraph 4 instructed the jury that Nickels was under no obligation to retreat if "he reasonably did not believe he could do so in complete safety." Accordingly, if the jury believed that Nickels did not retreat because he reasonably could not retreat, his failure to retreat did not preclude a finding that he acted in self-defense. We thus see little risk that Nickels was convicted based on a failure to retreat from a place from which retreat was impossible and conclude that leaving Nickels' convictions in place will result in no miscarriage of justice and no risk of damage to the integrity, reputation, and fairness of the judicial process. See *State v. Horne*, 315 Neb. 766, 1 N.W.3d 457 (2024). Accordingly, we find no plain error in the district court's self-defense instruction.

## 2. Character for Peacefulness During Prosecution's Case in Chief

Nickels next assigns that the district court erred by not allowing him to present evidence of his character for peacefulness during the State's case in chief. We find no merit to this assignment.

### (a) Additional Background

Following the shooting, Nickels left the hotel and drove to Missouri. While driving, Nickels called a few friends and family members and told them what happened. One of these family members was his stepson. During its case in chief, the State called Nickels' stepson as a witness, and he testified that, on the phone call, Nickels told him he had killed a "girl" in a hotel room.

During cross-examination of his stepson, Nickels sought to elicit evidence of his own character for peacefulness. The district court initially ruled that, for Nickels' character for peacefulness to be admissible, Nickels himself had to testify. Nickels argued otherwise.

The district court later changed its ruling on the issue. It informed Nickels that he would be able to present evidence of his character trait for peacefulness during his case in chief regardless of whether Nickels chose to testify. The district court stated, however, that it would continue to sustain objections to questions to Nickels' stepson regarding Nickels' character for peacefulness during the State's case in chief on the grounds that they were beyond the scope of the direct examination.

Nickels later called his stepson as a witness during his case in chief. His stepson testified that Nickels is calm, patient, and peaceful; that Nickels is not violent; and that he had never seen Nickels lose his temper.

### (b) Standard of Review

[8] The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007).

### (c) Analysis

Nickels contends that the district court erred by not allowing him to elicit evidence of his character for peacefulness during the prosecution's case in chief. He argues extensively that such evidence was admissible under Neb. Rev. Stat. § 27-405 (Reissue 2016) but says almost nothing about the district court's determination that such evidence exceeded the scope of the State's direct examination. For that reason alone, Nickels' argument fails.

Further, we can discern no possible harm to Nickels from the district court's ruling. Even assuming for the sake of argument that the district court erred by not allowing the testimony during the State's case in chief, Nickels was permitted to elicit testimony from his stepson regarding his character for peacefulness during his case in chief. This assignment of error lacks merit.

### 3. Ineffective Assistance: Failure to Adduce Evidence of Vargas' Violence

Beyond errors Nickels assigned to the district court, Nickels also assigns that his trial counsel provided ineffective assistance of counsel. Nickels' first assignment of ineffective assistance of counsel is that his trial counsel failed to elicit testimony from two witnesses who he claims would have testified to "violent, erratic, and aggressive behavior" of Vargas. For reasons we will explain, we find that even if Nickels' counsel performed deficiently, Nickels cannot show that he was prejudiced.

### (a) Additional Background

Nickels' counsel stated at a pretrial hearing that the defense planned to call Dezjarron Jones, who would testify to the fact that he had been in a relationship with Vargas and that she had "a propensity to act with volatility and aggression." At another pretrial hearing, Nickels' trial counsel stated that he planned to call Katherine Foley, an acquaintance of Vargas, who would "testify consistently with what [Jones] would testify to."

Nickels did not call Jones as a witness at trial. He did call Foley to testify to Vargas' character for violence. Nickels' counsel asked whether Foley believed Vargas had a propensity for violence, to which Foley said, "I believe she did." Trial counsel did not ask Foley any more questions.

On appeal, Nickels assigns that his counsel was ineffective in failing to elicit testimony from Jones and Foley as to specific occasions on which they observed Vargas acting violently or erratically. Specifically, Nickels asserts that Jones could have testified to "instances [of] violence on the part of [Vargas] that involved a firearm." Brief for appellant at 31. Nickels claims that Foley could have testified that Vargas assaulted her best friend on a number of occasions and, additionally, threatened Foley's children.

### (b) Analysis

Nickels asserts that his counsel should have elicited the testimony from Jones and Foley described above, as it would have strengthened his claim of self-defense. Nickels argues that if Jones and Foley had testified to specific instances of violent or erratic conduct by Vargas, it would support his contention that Vargas was the initial aggressor and that he shot her in self-defense.

[9,10] Generally, to prevail on a claim of ineffective assistance of counsel under the framework established by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Lopez*, 321 Neb. 118, 32 N.W.3d 868 (2026). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.*

[11-13] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability of prejudice is a probability sufficient to undermine confidence in the outcome. *Id.* In determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case. *Id.*

[14] An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record. *Id.* But if the record on direct appeal conclusively establishes either that trial counsel's performance was not deficient or that any deficient performance

did not prejudice the defendant's defense, an appellate court can determine trial counsel was not ineffective. *Id.*

In this case, even if we assume that Nickels' trial counsel performed deficiently by not eliciting the testimony Nickels describes, we conclude that the record conclusively establishes that Nickels was not prejudiced. The jury heard testimony from Nickels as to Vargas' violent and erratic behavior on the night of the shooting. It also heard Foley's testimony that Vargas had a propensity for violence. The testimony of Jones and Foley would have, at most, provided some additional evidence that Vargas was prone to violent or erratic behavior. Even so, we see no reasonable probability that the jury would have concluded that Nickels was entitled to shoot her.

Nickels was entitled to use deadly force against Vargas if he had a reasonable and good faith belief in the necessity of using deadly force. See *State v. Lopez*, 321 Neb. 118, 32 N.W.3d 868 (2026). Given Nickels' admissions that he never saw a gun in Vargas' possession on the day of the shooting, that Vargas had never been violent with him before, and that he could not even see if she was reaching in her backpack because it was covered by a jacket, we see no reasonable probability that the jury would have concluded that Nickels had a reasonable and good faith belief in the necessity of using deadly force if it had heard testimony regarding a few instances of Vargas' violent conduct. Because the record demonstrates that Nickels cannot establish prejudice, this claim of ineffective assistance of counsel is without merit.

### 4. INEFFECTIVE ASSISTANCE: USE OF THE WORD "MURDER"

Nickels also claims that his counsel provided ineffective assistance of counsel in another respect. Here, he contends that his counsel should have objected and moved for a mistrial based on the prosecutor's and a detective's use of the word "murder" during trial. He contends that in using the word

"murder," both the prosecutor and the detective offered an opinion as to Nickels' guilt. We find no merit to this claim.

### (a) Additional Background

Before Nickels' trial, he filed a motion in limine and asked the district court to, among other things, prevent the State from eliciting any opinions from witnesses as to Nickels' guilt. The parties stipulated to an order prohibiting the parties from "testifying as to the opinion of [Nickels'] guilt."

During trial, the State called a detective who testified about his investigation of the shooting. The State asked the detective a series of questions about why certain items found inside the hotel room were not tested. The detective explained that those items were not tested because Nickels was the only person in the hotel room with Vargas when she was shot and the other evidence was less probative. During that explanation, the detective used the word "murder" several times. For example, he stated that he knew who was in the room when Vargas was "murdered" and that he knew the other individuals who had been in the room with Vargas earlier did not "murder" her. On cross-examination, the detective also referred to the gun found on Nickels as "[t]he murder weapon."

During the detective's redirect testimony, the prosecutor also used the word "murder" in several questions. Most of those questions referred to Nickels as a "suspect in the murder of" Vargas. The prosecutor also asked a question referring to the "murder weapon."

At no point did Nickels' counsel object to the use of the word "murder." Nor did Nickels' trial counsel move for a mistrial on that basis.

### (b) Analysis

Nickels claims that the use of the word "murder" by the prosecutor and the detective amounted to the expression of an opinion as to Nickels' guilt. This, he claims, transgressed the district court's order in limine, caused the prosecutor to

violate his ethical duties, and should have prompted an objection and motion for mistrial by his counsel. We disagree. We find that there was no improper conduct nor any possibility of prejudice, and, thus, any objection or motion for mistrial would not have been successful.

We do not agree that the use of the word "murder" by either the prosecutor or the detective amounted to the expression of an opinion about Nickels' guilt. The detective was, in fact, investigating whether Vargas' death was a murder, and it is thus neither surprising nor improper that he would use that term while describing his investigation. Viewed in its proper context, the detective's testimony cannot be understood as containing an assertion about whether the elements of murder had been satisfied. As for the prosecutor, it was certainly not improper to refer to Nickels as being a suspect in Vargas' murder—Nickels was a suspect in Vargas' murder, and one could say so without expressing an opinion as to whether Nickels was guilty of murder.

When Nickels' arguments are considered within the context of this case, it becomes even clearer that the references were neither improper nor prejudicial. The parties agreed on almost all of the facts in this case, save for whether Nickels acted in self-defense when he shot Vargas. But none of the uses of the word "murder," by the prosecutor or the detective, can reasonably be understood as an expression of an opinion about whether Nickels had a valid self-defense claim. We see no basis to conclude that Nickels' counsel acted deficiently by failing to object or move for a mistrial based on the statements of the prosecutor and the detective.

[15] And even if we could look past the deficient performance prong, Nickels' ineffective assistance claim would still fail because had an objection or motion for mistrial been made, there is no reasonable probability that the outcome of the trial would have been different. An objection would have been unsuccessful because, as we explained above, the comments were not improper. Neither would a motion for mistrial

have been successful. A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024). The uses of the word "murder" here were not improper, and they certainly were not of such significance that they prevented Nickels from receiving a fair trial. Nickels' second ineffective assistance of counsel claim is meritless.

## IV. CONCLUSION

As we have discussed above, none of Nickels' assignments of error have merit. We therefore affirm his convictions.

Affirmed.